RICHARD HONG (*pro hac vice* admission to be filed)
Email: hongr@sec.gov
KRISTIN M. PAULEY (*pro hac vice* admission to be filed)
Email: pauleyk@sec.gov

Securities and Exchange Commission
New York Regional Office
Sanjay Wadhwa, Senior Associate Regional Director
Valerie A. Szczepanik, Assistant Regional Director
200 Vesey Street, Suite 400
New York, NY 10281-1022
Telephone: (212) 336-1100

JOHN B. BULGOZDY (Cal. Bar No. 219897)
Email: bulgozdyj@sec.gov
Local Counsel for Plaintiff
Securities and Exchange Commission
Los Angeles Regional Office
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 2:17-cv-01929 |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| NASIR N. SHAKOURI, ROBERT S. TORINO, BRONSON L. QUON, JOHN S. HONG, and JONATHAN K. SKARIE, | |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a)], and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a)].

2.      Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

3.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendants Nasir N. Shakouri ("Shakouri"), Bronson L. Quon ("Quon"), John S. Hong ("Hong") and Jonathan K. Skarie ("Skarie") reside in this district.

## SUMMARY

4.      This is a financial fraud case against five members of the southern California-based senior management of iPayment ("iPayment" or the "Company"), a provider of credit and debit card payment processing services.  From approximately February 2008 through August 2012, the Defendants violated the federal securities laws by perpetrating a scheme to embezzle funds from iPayment.  Defendants' fraudulent scheme resulted in a loss of approximately $11.6 million to iPayment, and caused the Company to file materially misstated reports with the Commission.  After

the discovery of the fraudulent scheme, iPayment filed a restatement for the periods affected by the fraud and disclosed material weaknesses in its internal controls over financial reporting.  During the relevant period, the Company had publicly-traded debt.

5.    Defendants Shakouri, iPayment's former Senior Vice President of Sales and Marketing, and Robert S. Torino ("Torino"), its former Executive Vice President and Chief Operating Officer, as two of the Company's most senior executives, based in iPayment's southern California office, were relied upon and trusted by iPayment's Chief Executive Officer and Chief Financial Officer.  Shakouri and Torino also were central to the fraudulent scheme.

6.    Abusing their positions of trust at iPayment, Shakouri and Torino devised, participated in, and executed the elaborate fraudulent scheme and recruited Defendants Quon (iPayment's former Vice President and Corporate Controller), Hong (its former Vice President of Information Technology) and Skarie (its Assistant Vice President of Merchant Operations) to assist, as needed, rewarding them for their assistance with misappropriated funds from iPayment.

7.    Defendants stole from iPayment through several means:  (a) Shakouri, Torino and Hong falsified employee expense reimbursements; (b) Shakouri, Torino and Hong conspired with third-party vendors to inflate invoices, and took overpayments in the form of kickbacks; (c) Shakouri, Torino and Quon misappropriated and used iPayment funds to purchase portfolios of merchant accounts, claiming commissions and bonuses on those stolen portfolios, and then sold those merchant portfolios back to iPayment; and (d) Shakouri, Torino, Quon and Skarie created fictitious sales agents and diverted existing iPayment merchant accounts on which no commissions were owed to those agents, and claimed and received origination credit, commission and bonuses on those diverted accounts.

8.    In furtherance of their fraudulent scheme, the Defendants falsified or caused to be falsified iPayment's books, records and accounts to hide the theft of

iPayment's corporate funds.  Defendants also knew that iPayment and its accountants would rely on the falsified books, records and accounts, and iPayment and its accountants did rely on the falsified books, records and accounts, which caused iPayment to suffer economic damage and to file false annual and quarterly reports with the Commission.  Moreover, in furtherance of their fraudulent scheme, Shakouri, Torino and Quon circumvented or overrode iPayment's internal accounting controls concerning expense reimbursements, vendor administration and residual payments, and lied to iPayment's outside auditor.

9.     Defendants' fraudulent conduct remained concealed for more than four years, until an iPayment executive revealed the financial fraud to iPayment's then-Chief Executive Officer and Chief Financial Officer in or about August 2012.  As a result of the Defendants' scheme, iPayment filed with the Commission materially misstated financial statements for the fiscal years ended December 31, 2009, 2010, and 2011, included in the Company's Annual Reports on Form 10-K for the years then-ended, and in the Company's Quarterly Reports on Forms 10-Q for the interim periods within such fiscal years, and the quarters ended March 31 and June 30, 2012 (all such interim and annual periods, collectively, the "Affected Periods").  iPayment filed audited re-stated financial statements for the Affected Periods with the Commission in or about January 2013 (the "Restatement").

## **VIOLATIONS**

10.     By virtue of the conduct alleged herein, the Defendants, directly or indirectly, singly or in concert, violated and are otherwise liable for violations of the federal securities laws, as follows:

11.     Shakouri and Torino:

- Violated Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1),  77q(a)(3)];
- Violated Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5)] and Rules 10b-5(a) and (c), 13b2-1 and 13b2-2

thereunder [17 C.F.R. §§ 240.10b-5(a) and (c), 240.13b2-1, 240.13b2-2]; and

- Aided and abetted violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)], Sections 10(b), 13(b)(2)(A) and (B), and 15(d) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(2)(A), 78m(b)(2)(B), 78o(d)] and Rules 10b-5(b), 12b-20, and 15d-1 thereunder [17 C.F.R. §§ 240.10b-5(b), 240.12b-20, 240.15d-1], in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

12. Quon:
- Violated Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1),  77q(a)(3)];
- Violated Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5)] and Rules 10b-5(a), (b) and (c), 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5(a), (b) and (c), 240.13b2-1, 240.13b2-2]; and
- Aided and abetted violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)], Sections 13(b)(2)(A) and (B), and 15(d) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(2)(B), 78o(d)] and Rules 12b-20 and 15d-1 thereunder [17 C.F.R. §§ 240.12b-20, 240.15d-1], in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

13. Hong and Skarie:
- Violated Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1),  77q(a)(3)];

- Violated Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5)] and Rules 10b-5(a) and (c), and 13b2-1 thereunder [17 C.F.R. §§ 240.10b-5(a) and (c), 240.13b2-1]; and

- Aided and abetted violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)], Sections 10(b), 13(b)(2)(A), and 15(d) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(2)(A), 78o(d)] and Rules 10b-5(b), 12b-20 and 15d-1 thereunder [17 C.F.R. §§ 240.10b-5(b), 240.12b-20, 240.15d-1], in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

14.    Unless the Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, transactions and courses of business set forth in this Complaint and in the acts, practices, transactions and courses of business of similar type and object.

15.    Accordingly, the Commission seeks a judgment against all Defendants ordering permanent injunctive relief, disgorgement with prejudgment interest, civil penalties, officer and director bars, and other appropriate and necessary equitable relief.

## **DEFENDANTS**

16.    **Shakouri**, age 39, resides in Calabasas, California.  From 2003 until his resignation on May 29, 2012, Shakouri was iPayment's Senior Vice President of Sales and Marketing.  In addition, Shakouri was a principal and co-owner (with Torino) of Vinmost Holdings LLC ("Vinmost Holdings"), a dissolved Nevada limited liability company.  Shakouri previously worked at two accounting firms and holds an accounting and finance undergraduate degree.

17.    **Torino**, age 63, is a resident of Norwell, Massachusetts.  Between 2001 and September 2012, Torino was employed by iPayment in various executive positions.  Between 2006 and his termination on September 6, 2012, Torino was

iPayment's Executive Vice President and Chief Operating Officer. In addition, Torino was a principal and co-owner (with Shakouri) of Vinmost Holdings. Torino was a CPA, but his license in Massachusetts expired in 1997.

18. **Quon**, age 39, is a resident of Playa Vista, California. From 2008 until his resignation on September 7, 2012, Quon was iPayment's Vice President and Corporate Controller. Quon is one of the signatories to the Form 10-K filed by iPayment for the fiscal year ended December 31, 2011. He previously worked at an accounting firm and a consulting firm within their respective assurance and advisory practices. Quon is a CPA, but his license in California is inactive.

19. **Hong**, age 45, is a resident of Moorpark, California. From 2007 until iPayment terminated his employment on September 6, 2012, Hong was iPayment's Vice President of Information Technology with responsibility for all iPayment's software and systems. In addition, Hong was and is the principal and sole shareholder of JSH Works, Inc. ("JSH Works"), a private California corporation.

20. **Skarie**, age 40, is a resident of Agoura Hills, California. Skarie has been employed at iPayment since 2003, and currently is iPayment's Assistant Vice President of Merchant Operations. Skarie passed the CPA exam, but has never held a CPA license.

## RELEVANT ENTITY AND INDIVIDUALS

21. **iPayment** is a Delaware corporation formed in 2002, with its corporate headquarters currently located in New York, New York, and previously located in Nashville, Tennessee. iPayment provides credit and debit card payment processing services to small merchants across the United States. For a portion of the relevant period (May 2011 through August 2012), iPayment's then-Chairman and Chief Executive Officer controlled 100% of the equity interests and voting power of iPayment Investors, L.P. ("iPayment Investors"), the ultimate parent of iPayment. iPayment Holdings, Inc. ("Holdings") is the direct parent of iPayment. In May 2011, both iPayment and Holdings completed debt offerings, registering notes with the

Commission pursuant to Form S-4, effective December 21, 2011.  The Form 10-K filed by iPayment for the fiscal year ended December 31, 2011 on or about March 23, 2012, was required to be filed pursuant to Section 15(d) of the Exchange Act (the "2011 Form 10-K"), but the other Forms 10-K and 10-Q filed by iPayment during the Affected Periods were filed voluntarily.  Although iPayment's filings during the relevant period (except for the required 2011 Form 10-K) were voluntary under the federal securities laws, iPayment and Holdings were required by the terms of their debt agreements to make timely financial statement filings with the Commission. iPayment no longer has publicly-traded debt and is now entirely privately-held.

22.    **Individual A** was and is the principal and sole shareholder of two third-party vendors that provided Information Technology ("IT") and other services to iPayment.

23.    **Individual B** was and is the principal and sole shareholder of two third-party vendors that provided IT and other services to iPayment.

24.    **Individual C** was the President of THS Holdings, Inc. ("THS"), a dissolved Nevada corporation.

## FACTUAL BACKGROUND

25.    Defendants knew, or were reckless in not knowing, that iPayment made periodic filings with the Commission and that, because of their fraudulent scheme described herein, iPayment's filings during the Affected Periods would and did contain material misstatements and omissions.

26.    In August 2012, an iPayment executive revealed the Defendants' financial fraud to iPayment's then-Chief Executive Officer and Chief Financial Officer.  iPayment conducted an internal investigation of the alleged misconduct.  On or about November 5, 2012, iPayment released a Current Report on Form 8-K to publicly disclose an update on the Company's internal investigation and to discuss

non-reliance on the previously issued financial statements for the Affected Periods.

iPayment filed the Restatement for the Affected Periods in or about January 2013.[1]

27.    Defendants' fraudulent conduct, which led to iPayment's decision to file the Restatement, falls into three categories, as described below.

**Expense Reimbursement Scheme**

28.    From approximately February 2008 to approximately June 2012, Shakouri and Torino exploited iPayment's corporate practice of permitting executives to incur business expenses on their personal credit cards.  Shakouri and Torino sought and received "reimbursement" from iPayment for over $2.4 million, amounts they claimed to have paid to third-party vendors when, in fact, such amounts had never been requested by, or paid to, the vendors.

29.    Shakouri and Torino recruited Hong in this scheme, because of his expertise and authority concerning IT-related issues at iPayment, and Quon, because of his familiarity with iPayment's accounting systems and authority to approve reimbursement requests.

30.    The majority of the fraudulent reimbursement requests, totaling over $1.84 million, sought reimbursement for Dell computer equipment that Shakouri, Torino or Hong purportedly had purchased for iPayment using their personal credit cards.  In total, Shakouri stole approximately $1.3 million through approximately nine fake reimbursement requests for Dell computer equipment from in or about March 2008 through February 2012; Torino stole approximately $350,000 from iPayment through approximately four fake reimbursement requests for Dell computer equipment from in or about May 2011 through June 2012; and Hong stole approximately $193,000 from iPayment through approximately two fake

---

[1] The Restatement also included restated unaudited quarterly financial information for each of the years ended December 31, 2009, 2010, and 2011.

reimbursement requests for Dell computer equipment in or about April 2008 and January 2011.

31.    In connection with the fake reimbursement request Hong submitted in or about January 2011, Shakouri told Hong that because Hong was not receiving a yearly bonus from iPayment, he should create paperwork so that Hong would receive a payment in lieu of a bonus.  For this reason, Hong submitted a false reimbursement request for $97,674.93.

32.    In or about February 2008, Shakouri also submitted a fraudulent reimbursement request in the amount of approximately $53,000 in connection with a fake contract between iPayment and The Green Sheet, Inc. ("The Green Sheet"), an advertising company.  In fact, iPayment did not have a contract with, and Shakouri had not paid $53,000 to, The Green Sheet, but Shakouri nevertheless falsely obtained payment from iPayment on this request.

33.    In addition, Shakouri falsified invoices and credit card statements and submitted false reimbursement requests for approximately $410,000, which Torino or Quon approved, in connection with otherwise legitimate invoices iPayment received from Barracuda Networks for IT hardware; the Las Ventanas hotel in Cabo San Lucas, in connection with iPayment's then-annual executive retreat; and the Four Seasons hotel in Hawaii, in connection with another iPayment executive retreat.  In total, Shakouri improperly received from iPayment approximately:  (i) $197,000 in connection with the Barracuda invoice in or about November 2008; (ii) $90,000 in connection with the Las Ventanas invoices in or about July and October 2011; and (iii) $123,000 in connection with the Four Seasons invoices in or about October and December 2008, and January 2009.

34.    Finally, Shakouri requested that Individual A, a close personal friend of Shakouri's, submit falsified invoices from his company for IT services and products purportedly developed or delivered to iPayment so that Shakouri could seek reimbursement from iPayment for the falsified amounts.  In total, with approval from

Torino or Quon, Shakouri stole approximately $125,000 from iPayment through fake reimbursement requests for IT services or products from Individual A's company from in or about October 2009 through December 2011.

35.    Shakouri, Torino, Hong and Quon each knew, or were reckless in not knowing, that the reimbursed amounts had never been required by, or paid to, the third-party vendors.

**Kickback Scheme**

36.    Beginning in or about April 2011 and continuing through in or about August 2012, Shakouri and Torino caused iPayment to contract with third-party vendors owned by two individuals with whom they had close relationships — Individual A and Individual B — to provide certain IT services to the Company.

37.    Shakouri and Torino caused Individual A and Individual B to inflate the invoices submitted to iPayment, and Individual A and Individual B then kicked back the overcharged amounts, which totaled approximately $2.1 million, to Vinmost Holdings, an entity owned and controlled by Torino and Shakouri.

38.    Hong approved many of these invoices, in his capacity as Vice President of Information Technology, as did Shakouri and, at times, Torino.  Shakouri and Torino paid Hong for his participation in the scheme, usually by providing Hong with checks made payable to Hong or to Hong's company, JSH Works.

39.    Between May 2011 and August 2012, the vendors owned by Individual A paid Vinmost Holdings approximately $1.4 million in kickbacks, and the vendors owned by Individual B paid Vinmost Holdings approximately $700,000 in kickbacks. Of those amounts, Hong received approximately $635,433 in payments from Shakouri and Torino.

40.    Shakouri, Torino and Hong each knew, or were reckless in not knowing, that the third-party vendors owned by Individual A and Individual B overcharged iPayment for IT-related services and kicked back the overcharged amounts to Vinmost Holdings.

**Merchant Fraud Schemes**

41.    By way of background, iPayment obtains merchant accounts in two ways — through its own salaried employees and through referrals by a network of independent sales offices ("ISOs"), which are non-employee, external sales organizations with which iPayment has contractual relationships.

42.    When a merchant account is referred by an ISO, iPayment pays the ISO a percentage of the income iPayment derives from the transactions iPayment processes through that merchant account, called a "residual."  Under some circumstances, iPayment will also pay an ISO a bonus and/or referral fee for generating business for the Company.  In addition, iPayment may purchase future residual payment streams from an ISO in a residual buy-out transaction ("RBO") so that it is no longer obligated to pay residuals on those accounts.  Thus, an ISO can earn money from residuals, bonuses, referrals and RBOs.

43.    Merchant accounts obtained through iPayment's own salaried employees are called "House" accounts and no residuals or other payments are paid on those accounts.

44.    By engaging in the various forms of unlawful conduct described below in paragraphs 45 through 73, Shakouri and Torino defrauded iPayment of residuals and other related payments totaling over $6.1 million, recruiting Quon and Skarie to assist in carrying out their fraudulent scheme, and rewarding them for their assistance with residual and other payments stolen from iPayment.

*Discontinued Merchant Account Program Kickbacks*

45.    Beginning in or about October 2007, iPayment instituted a Discontinued Merchant Account Program ("DAP") through which it sought to re-sign merchants that had ceased using iPayment services ("discontinued merchants").

46.    Shakouri caused iPayment to execute a contract in or about October 2007, with THS, an entity owned by Individual C.  The contract entitled THS to a

percentage of iPayment's fee revenue stream from each merchant account re-signed by THS.

47.    Torino and Shakouri thereafter caused iPayment's books and records to be altered so that approximately 40 active House accounts (for which Shakouri and Torino knew, or were reckless in not knowing, that iPayment owed no residual) would be reclassified as discontinued merchant accounts that THS had supposedly re-signed under DAP, causing iPayment to improperly pay approximately $745,000 in residuals on these House accounts to THS from in or about March 2009 to in or about August 2012.

48.    A portion of the residuals was retained by Individual C, and the remainder was kicked back in equal amounts to Torino, Shakouri and another iPayment executive.

49.    Torino and Shakouri did not disclose to, and indeed concealed from, iPayment the fact that they were receiving a portion of the residual payments made to THS in connection with DAP.

### ISO #02061 Buy-Out

50.    ISO #02061 was one of iPayment's top-performing ISOs.

51.    On or about September 1, 2008, Shakouri and Torino arranged to have THS purchase ISO #02061's merchant customer accounts.  Shakouri and Torino agreed that THS would enter into this transaction using the name "iPayment West Acquisition Corp." or "IPMT West" (collectively, "iPayment West") — a d/b/a for THS that is similar to "iPayment" — so that ISO #02061 would believe it was contracting with iPayment.  Shakouri and Torino did not disclose to, and indeed concealed, from iPayment and ISO #02061 the fact that iPayment West was, in reality, THS.

52.    To pay for iPayment West's purchase of ISO #02061's accounts, Shakouri and Torino caused iPayment to pay approximately $927,000 to ISO #02061

1   from in or about September 2008 and continuing through in or about November 2009.

2   53.   After the deal closed, Shakouri and Torino, with assistance from Skarie,

3   altered the books and records of iPayment to re-route ISO #02061's accounts to

4   iPayment West's account number, diverting to iPayment West the continuing revenue

5   stream on the "re-routed" accounts.

6   54.   Thus, in addition to the amounts stolen from iPayment to finance THS's

7   (or iPayment West's) purchase of ISO #02061's merchant accounts, iPayment West

8   received the vast majority of the approximately $700,000 in residual payments that

9   iPayment made from in or about October 2008 continuing through in or about April

10  2010, which it distributed to Shakouri, Torino, Individual C and another iPayment

11  executive.

12  55.   Torino and Shakouri did not disclose to, and indeed concealed from,

13  iPayment the fact that they were receiving a portion of the improper residual

14  payments made to iPayment West in connection with THS's purchase of #02061's

15  merchant accounts, using stolen iPayment funds.

16  *THS Buy-out*

17  56.   Shakouri and Torino next arranged for iPayment to buy iPayment West's

18  merchant portfolio, which THS (d/b/a iPayment West) had previously purchased

19  from ISO #02061 using monies stolen from iPayment.

20  57.   On or about February 10, 2010, Torino, purportedly acting on behalf of

21  iPayment, entered into an agreement with THS (which included iPayment West and

22  its other d/b/a's) to buy-out the THS merchant accounts procured by THS from ISO

23  #02061 for approximately $1.625 million.

24  58.   Under the terms of the deal, iPayment was to receive a guaranteed

25  income stream of $50,000 per month for 26 months (to be effected by iPayment

26  withholding $50,000 per month in residuals otherwise due and owing to THS).  In the

27  27th month, iPayment would designate select THS merchant accounts having a

28

collective anticipated residual income stream totaling $50,000 per month to be transferred by THS to iPayment for no additional consideration.

59. In seeking approval of this deal from iPayment, Shakouri and Torino failed to disclose to, and indeed concealed from, iPayment's senior management that: (i) iPayment already had transferred approximately $927,000 related to THS's purchase of ISO #02061's merchant accounts; and (ii) Shakouri and Torino were on both sides of the transactions.

60. After iPayment withheld the $50,000 residual from THS for the first month, Shakouri and Torino caused iPayment's books and records to be altered so that iPayment ceased withholding from THS the $50,000 per month hold-back. At the end of the 26-month period, Shakouri and Torino caused iPayment to forego the merchant selection process, and no THS merchant accounts were ever transferred to iPayment per the terms of the February 10, 2010 deal.

### *Transfer of Residuals to Fictitious ISOs*

61. Beginning in or about March 2010 (one month after the THS buy-out), Shakouri and Torino caused iPayment's books and records to be altered to transfer the residual payments owing on certain THS accounts obtained from ISO #02061 (which iPayment had purchased one month earlier for approximately $1.625 million) to six entities fictitiously posing as ISOs, but actually owned by Shakouri, Torino, Quon and Skarie.

62. To effect these transfers, Shakouri involved Skarie in the scheme, as Skarie was the individual at iPayment responsible for approving all residual payments. Shakouri gave Skarie documents for the six fictitious ISOs and a list of merchant accounts, which Skarie recognized as being from the THS portfolio. Shakouri instructed Skarie to select accounts to assign to each of the six fictitious ISOs that would generate the amount of monthly residual income that Shakouri had requested. Skarie then emailed the iPayment IT department to request that certain merchants be transferred to the six fictitious ISOs.

COMPLAINT                                          15

63.    For the four fictitious ISOs that connected to a bank account jointly owned and controlled by Shakouri and Torino (#2635, #2636, #2637, #2638), Shakouri and Torino intentionally chose names that were deceptively similar to the names of legitimate iPayment ISOs.  Shakouri and Torino instructed Quon and Skarie to do the same.  Fictitious ISO #2633 connected to a bank account owned or controlled by Quon, and fictitious ISO #2634 connected to a bank account owned or controlled by Skarie.  Shakouri, Torino, Quon and Skarie also signed the account paperwork for the six fictitious ISOs with iPayment using fake names, so as to not reveal to iPayment their connections to the fictitious ISOs.

64.    Shakouri, Torino, Quon and Skarie each knew, or was reckless in not knowing, that they had not recruited any of the merchant accounts assigned to the six fictitious ISOs, nor had they assumed any new responsibilities in exchange for the additional compensation received from iPayment in the form of residual payments.

65.    Shakouri initially told Skarie in or about March 2010 that the residual payments were an approved form of additional compensation for certain iPayment executives.  However, by no later than mid-2011, Skarie realized that, contrary to what he had been told by Shakouri (that the residual payments served as an additional form of compensation), Skarie was involved in a scheme to defraud iPayment.

66.    Over time, the amount of monthly residuals owing on the merchant portfolio that THS (d/b/a iPayment West) had "purchased" from ISO #02061 using stolen funds from iPayment decreased due to normal attrition.  To make up for this attrition, Shakouri and Torino caused iPayment's books and records to be altered to transfer additional House accounts to the fictitious ISOs owned by Shakouri and Torino to maintain the residual payment sums received on the merchant accounts that THS stole from iPayment.

67.    Shakouri and Skarie later devised a new scheme whereby Skarie caused iPayment's books and records to be altered to pay "bonus" and "referral" payments to three new fictitious ISOs (#2826, #2827, #2828), which were each connected to a

joint bank account owned by Shakouri and Torino.[2]  In total, from in or about December 2010 continuing through in or about December 2011, Skarie, acting at Shakouri's direction, caused iPayment to pay approximately $275,000 in fictitious "bonuses" and "referral" payments to the three new fictitious ISOs.

68.     Shakouri, Torino and Skarie each knew, or was reckless in not knowing, that no such bonuses or referral payments were due and owing to any of the new fictitious ISOs under any agreement with iPayment.

### *ODC House Accounts Diversion*

69.     Shakouri and Torino also focused on the House accounts at Online Data Corporation ("ODC"), a division of iPayment.

70.     As they had with the other House accounts, Shakouri and Torino, with Skarie's assistance, caused iPayment's books and records to be altered to transfer ODC House accounts to six other fictitious ISOs created for the purpose of receiving improper residual payments from iPayment (#117399, #117400, #117401, #117402, #117475, #GW9100).

71.     Approximately $600,000 was stolen from iPayment in this manner from in or about November 2010 to August 2012.  The fictitious ISOs that received improper residual payments on ODC House accounts were connected to bank accounts owned by Shakouri, Torino, Quon and Skarie.

72.     In total, from in or about June 2010 continuing through in or about August 2012, the fictitious ISOs owned by Shakouri and Torino received approximately $1.4 million in improper residual payments; the fictitious ISOs owned by Quon received approximately $380,000 in improper residual payments; and the fictitious ISOs owned by Skarie received approximately $650,000 in improper

---

[2]  Bonuses are a fixed amount per merchant signed and referral payments are paid to ISOs for recruiting new ISOs and taken out of the residual payments through what was called an override, or a split commission.

residual payments.

73.    Shakouri, Torino, Quon and Skarie each knew, or was reckless in not knowing, that the residual payments paid by iPayment to bank accounts they each owned were not due or owing under any agreement with iPayment.

**iPayment's Commission Filings**

74.    The Restatement disclosed that the total embezzlement costs incurred by the Company through December 31, 2011, were approximately $9.5 million.  The Restatement further discloses that the total embezzlement costs incurred by the Company for the three months ended March 31, 2012, and June 30, 2012, were approximately $922,000 and $1.202 million, respectively.

75.    In the Restatement, iPayment also disclosed five material weaknesses in its internal control over financial reporting that enabled the Defendants to commit the fraudulent schemes without detection:

a.    Entity Level Controls:  The Company's entity level controls were not effectively designed or applied to prevent members of senior management and other employees from having the ability to circumvent or override controls around residual payments, expense reimbursements, and vendor administration.

b.    Accounts Payable:  Misappropriation of Company assets occurred, in part, as a result of an inadequate design of controls around vendor due diligence review and bidding, as well as the override of certain existing controls in the areas of master vendor file data administration and approval of vendor invoices.

c.    Sales Agent Verification:  The Company did not maintain effective internal controls with respect to verifying the authenticity of ISOs or preventing the re-direction of residual payments to fictitious ISOs created by members of management.

d.    Expense reimbursements:  Certain employees were allowed to use personal credit cards to make large dollar purchases rather than those purchases

being centrally approved by the purchasing department and centrally processed by the accounts payable department.

e.  <u>Manual Journal Entries</u>:  Effective policies and procedures were not in place to ensure that manual journal entries were accompanied by sufficient supporting documentation, that supporting documentation was not properly retained, and that these journal entries were adequately reviewed and approved.

76.  Shakouri and Torino, as the two senior-most officers in iPayment's southern California office, and Quon, as the Corporate Controller, were each responsible for devising and maintaining the Company's system of internal accounting controls.

77.  Through their knowledge of and participation in the embezzlement scheme, Shakouri, Torino and Quon each knowingly circumvented iPayment's system of internal accounting controls or failed to implement a system of internal accounting controls at iPayment around expense reimbursements, vendor administration and residual payments.

**Lying to iPayment's Outside Auditor**

78.  Shakouri, Torino and Quon also each made or caused to be made materially false or misleading statements to iPayment's outside auditor.

79.  During the Affected Periods, Quon was responsible for providing documentation and information to the outside auditor, responding to quarterly inquiries regarding the existence and risk of fraud, and signing management representation letters that management was, among other things, not aware of any fraud and that all transactions with related parties had been properly recorded and/or disclosed in the consolidated financial statements.

80.  During the Affected Periods, Shakouri and Torino also approved documentation and information that they each knew, or were reckless in not knowing, would be transmitted to the outside auditor, and responded to quarterly inquiries

1    regarding the existence and risk of fraud.

2        81.    The outside auditors made at least three inquiries of each of Shakouri,

3    Torino and Quon during its audit for the 2011 fiscal year, on May 9, 2011, August 10,

4    2011 and November 9, 2011, and each of Shakouri, Torino and Quon represented

5    falsely to the outside auditor in response to each inquiry that they each had no

6    knowledge of fraud.

7        82.    Quon also signed the management representation letter in connection

8    with the outside auditor's 2011 audit, dated March 23, 2012, falsely asserting that he

9    had no knowledge of any fraud and that all related-party transactions had been

10    properly recorded and/or disclosed in the consolidated financial statements.

11        83.    Quon, Shakouri, and Torino each knew or was reckless in not knowing

12    that their representations to the outside auditor were false at the time they were made.

13    ## FIRST CLAIM FOR RELIEF

14    ### FRAUD IN THE OFFER OR SALE OF SECURITIES

15    **Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act**

16    **(All Defendants)**

17        84.    The Commission realleges and incorporates by reference paragraphs 1

18    through 83 above.

19        85.    By engaging in the conduct described above, Defendants Shakouri,

20    Torino, Quon, Hong and Skarie, and each of them, directly or indirectly, in the offer

21    or sale of securities and by the use of the means or instruments of transportation or

22    communication in interstate commerce or by use of the mails (i) knowingly,

23    recklessly or negligently, employed devices, schemes, or artifices to defraud; and (ii)

24    engaged in transactions, practices, or courses of business which operated or would

25    operate as a fraud or deceit upon the purchaser.

26        86.    By engaging in the conduct described above, Defendants Shakouri,

27    Torino, Quon, Hong and Skarie, and each of them, violated, and unless restrained and

28    enjoined, will continue to violate Sections 17(a)(1) and 17(a)(3) of the Securities Act

COMPLAINT                                    20

1    [15 U.S.C. §§ 77q(a)(1) & 77q(a)(3)].

2    ## SECOND CLAIM FOR RELIEF

3    **FRAUD IN CONNECTION WITH THE PURCHASE AND SALE OF SECURITIES**

4    **Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c)**

5    **(All Defendants)**

6    87.    The Commission realleges and incorporates by reference paragraphs 1

7    through 83 above.

8    88.    By engaging in the conduct described above, Defendants Shakouri,

9    Torino, Quon, Hong and Skarie, and each of them, directly or indirectly, in

10    connection with the purchase or sale of securities and by the use of the means or

11    instrumentalities of interstate commerce or of the mails, or of the facilities of a

12    national securities exchange, with scienter:  (i) employed devices, schemes, or

13    artifices to defraud; and (ii) engaged in acts, transactions, practices, or courses of

14    business which operated or would operate as a fraud or deceit upon other persons.

15    89.    By engaging in the conduct described above, Defendants Shakouri,

16    Torino, Quon, Hong and Skarie, and each of them, violated, and unless restrained and

17    enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. §

18    78j(b)], and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a) &

19    240.10b-5(c)].

20    ## THIRD CLAIM FOR RELIEF

21    **FRAUD IN CONNECTION WITH THE PURCHASE AND SALE OF SECURITIES**

22    **Violations of Section 10(b) of the Exchange Act and Rules 10b-5(b)**

23    **(Defendant Quon)**

24    90.    The Commission realleges and incorporates by reference paragraphs 1

25    through 83 above.

26    91.    By engaging in the conduct described above, Defendant Quon, directly

27    or indirectly, in connection with the purchase or sale of securities and by the use of

28    the means or instrumentalities of interstate commerce or of the mails, or of the

facilities of a national securities exchange, with scienter, made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.

92. By engaging in the conduct described above, Defendant Quon violated, and unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## FOURTH CLAIM FOR RELIEF

### FALSIFICATION OF ACCOUNTING RECORDS

### Violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-1

### (All Defendants)

93. The Commission realleges and incorporates by reference paragraphs 1 through 83 above.

94. By engaging in the conduct described above, Defendants Shakouri, Torino, Quon, Hong and Skarie, and each of them, directly or indirectly, have knowingly circumvented or knowingly failed to implement a system of internal accounting controls or knowingly falsified or caused to be falsified any book, record or account subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)].

95. By engaging in the conduct described above, Defendants Shakouri, Torino, Quon, Hong and Skarie, and each of them, violated, and unless restrained and enjoined, will continue to violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)], and Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

## FIFTH CLAIM FOR RELIEF

### LYING TO THE AUDITOR

### Violations of Exchange Act Rule 13b2-2

### (Defendants Shakouri, Torino and Quon)

96.    The Commission realleges and incorporates by reference paragraphs 1 through 83 above.

97.    By engaging in the conduct described above, Defendants Shakouri, Torino and Quon, and each of them, while acting as officers of an issuer, directly or indirectly, have (i) made or caused to be made materially false or misleading statements to an accountant in connection with; or (ii) omitted to state, or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with: any audit, review or examination of the financial statements of the issuer required to be made pursuant to Section 13 of the Exchange Act [15 U.S.C. § 78m(b)(2)], or the preparation or filing of any document or report required to be filed with the Commission pursuant to Section 13 of the Exchange Act [15 U.S.C. § 78m(b)(2)], or otherwise.

98.    By engaging in the conduct described above, Defendants Shakouri, Torino and Quon, and each of them, violated, and unless restrained and enjoined, will continue to violate Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## SIXTH CLAIM FOR RELIEF

### AIDING AND ABETTING

### FRAUD IN THE OFFER OR SALE OF SECURITIES

### Violations of Section 15(b) of the Securities Act

### (All Defendants)

99.    The Commission realleges and incorporates by reference paragraphs 1 through 83 above.

100.    By engaging in the conduct described above, Defendants Shakouri,

Torino, Quon, Hong and Skarie knowingly or recklessly provided substantial assistance to iPayment, who, directly or indirectly, in the offer or sale of securities and by use of the means or instruments of transportation or interstate communication in interstate commerce or by the use of mails, obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.

101.   By engaging in the conduct described above, Defendants Shakouri, Torino, Quon, Hong and Skarie aided and abetted, and unless restrained and enjoined will continue to aid and abet, violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)], in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)].

## SEVENTH CLAIM FOR RELIEF

### AIDING AND ABETTING

### FRAUD IN CONNECTION WITH THE PURCHASE AND SALE OF SECURITIES

### Violations of Section 20(e) of the Exchange Act

### (Defendants Shakouri, Torino, Hong and Skarie)

102.   The Commission realleges and incorporates by reference paragraphs 1 through 83 above.

103.   By engaging in the conduct described above, Defendants Shakouri, Torino, Hong and Skarie knowingly or recklessly provided substantial assistance to iPayment and Quon, who each, directly or indirectly, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, with scienter, made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.

104.   By engaging in the conduct described above, Defendants Shakouri,

Torino, Hong and Skarie aided and abetted, and unless restrained and enjoined will continue to aid and abet, violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)], in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## EIGHTH CLAIM FOR RELIEF

### AIDING AND ABETTING VIOLATIONS OF

### SECTION 15(d) OF THE EXCHANGE ACT AND RULES 12b-20 AND 15d-1 THEREUNDER

### Violations of Section 20(e) of the Exchange Act

### (All Defendants)

105.   The Commission realleges and incorporates by reference paragraphs 1 through 83 above.

106.   By engaging in the conduct described above, Defendants Shakouri, Torino, Quon, Hong and Skarie knowingly or recklessly provided substantial assistance to iPayment, who (i) failed to file an annual report within the period specified in the appropriate report form for the fiscal year in which a registration statement under the Securities Act became effective and for each fiscal year thereafter, unless the registrant is exempt from such filing by Section 15(d) of the Exchange Act [15 U.S.C. § 78(o)], or the rules thereunder; and (ii) failed to include in a statement or report the information expressly required to be included in a statement or report and such further material information as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading.

107.   By engaging in the conduct described above, Defendants Shakouri, Torino, Quon, Hong and Skarie aided and abetted, and unless restrained and enjoined will continue to aid and abet, violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], and Rules 12b-20 and 15d-1 thereunder [17 C.F.R. §§ 240.12b-20 & 240.15d-1], in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

# NINTH CLAIM FOR RELIEF

## AIDING AND ABETTING VIOLATIONS OF
## SECTION 13(b)(2)(A) OF THE EXCHANGE ACT
### Violations of Section 20(e) of the Exchange Act
### (All Defendants)

108.   The Commission realleges and incorporates by reference paragraphs 1 through 83 above.

109.   By engaging in the conduct described above, Defendants Shakouri, Torino, Quon, Hong and Skarie knowingly or recklessly provided substantial assistance to iPayment, who failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

110.   By engaging in the conduct described above, Defendants Shakouri, Torino, Quon, Hong and Skarie aided and abetted, and unless restrained and enjoined will continue to aid and abet, violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)], in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

# TENTH CLAIM FOR RELIEF

## AIDING AND ABETTING VIOLATIONS OF
## SECTION 13(b)(2)(B) OF THE EXCHANGE ACT
### Violations of Section 20(e) of the Exchange Act
### (Defendants Shakouri, Torino and Quon)

111.   The Commission realleges and incorporates by reference paragraphs 1 through 83 above.

112.   By engaging in the conduct described above, Defendants Shakouri, Torino and Quon knowingly or recklessly provided substantial assistance to iPayment, who failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in

accordance with management's general or specific authorization; (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

113.   By engaging in the conduct described above, Defendants Shakouri, Torino and Quon aided and abetted, and unless restrained and enjoined will continue to aid and abet, violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)], in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### II.

Issue judgments, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Shakouri, Torino, Quon, Hong and Skarie, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from further violations of the relevant securities laws identified above.

### III.

Order Defendants to disgorge all ill-gotten gains from the illegal conduct alleged herein, together with prejudgment interest thereon.

## IV.

Order Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## V.

Order that Defendants each be barred from serving as an officer and director of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  March 10, 2017                    Respectfully submitted,

                                          */s/ John B. Bulgozdy*
                                          John B. Bulgozdy, Local Counsel
                                          SECURITIES AND EXCHANGE
                                          COMMISSION

                                          Richard Hong
                                          (*pro hac vice* admission to be filed)
                                          Kristin M. Pauley
                                          (*pro hac vice* admission to be filed)
                                          Attorneys for Plaintiff
                                          SECURITIES AND EXCHANGE
                                          COMMISSION

COMPLAINT                         28